## HATHORN vs. STINSON & als.

It is the duty of the Court, to charge the jury upon the law applicable only to the facts proved, but not to answer abstract questions, not arising in the case on trial.

Where one being the owner of a mill and dam, and also of certain land above, which was flowed by such dam, sold the mill, with all its privileges and appurtenances, he could not afterward compel the grantee of the mill to remunerate him for the injury caused by such flowing; — and in such case the grantee of the mill would have the right to continue the dam so as to raise the same head of water, as the grantor had been accustomed to raise before the grant.

If one, liable to damages for flowing the land of another, acquire a title to the land flowed, the right to recover damages for such flowing is absolutely *extinguished*, and not merely *suspended;* — so that upon the unity of title being afterwards destroyed by conveyance or otherwise, the right to compensation for the injury of flowing would not thereby be revived.

Whether . the flowing of lands, for the support of mills *any length of time*, will afford presumptive evidence of a *license — quære.*

THIS was a complaint under *stat.* of 1821, *ch.* 45, for flowing the complainant's land, and was tried before the *Chief Justice*, at the *Dec. Term*, 1832. The respondents pleaded the general issue and filed a brief statement. To maintain the issue on his part, the plaintiff introduced a deed of lot No. 49, in the town of *Woolwich* (it being the land flowed) from *Jonathan Eames, Jr.* to *John Hathorn*, dated *October* 20, 1777 ; and then deduced his title through a great number of *mesne* conveyances from the latter to himself. Lot No. 49, owned by the complainant, and the flowing of which was complained of, was bounded on, or included a part of, *Neguasset* pond in the town of *Woolwich*. The mills of the respondent stand on a stream issuing from said pond, and on the lot below and adjoining No. 49.

It was admitted that the whole land where the dam, mills, pond and lot No. 49 are, was once owned by a proprietary in common and undivided. The title of the plaintiff to the land flowed, and of the respondent to the mills on the stream below, were also admitted. The deeds, introduced by the respondent, (which were twenty in number,) exhibited several names among both

grantors and grantees which were also found in the deeds of the plaintiff through which he claimed title.

The plaintiff introduced several witnesses ; *Solomon Walker*, testified that he knew the land and that it had been flowed by the defendant's dam.  *John Shaw*, testified that he knew the land flowed — had known it since 1775 or 6, and that it had been flowed during the whole of that period.  That there had been a dam and mills where the defendants' now stand as long ago as he could remember — that in 1775 or 6, there were two saw mills and a grist mill — a saw mill and grist mill called *Paine's* mills, and a saw mill on the east side called *Farnham's* mill — that the *Stinsons* have flowed for 50 years, and that the mills were old when he first knew them.  That the dam was rebuilt 40 or 50 years ago and raised 18 or 20 inches — and that the dam before that was high enough to flow the land — that there was no complaint of flowage until after the fish ways were made, nor till recently.

The defendant then introduced his deeds aforesaid, *Joseph Paine* being among the grantors.  Also a vote passed at a Proprietors' meeting, *Aug.* 27, 1776, authorising *Cadwallader Ford*, and such as might join, *to erect a saw mill upon the interest of the Proprietary*, &c.  A vote at another meeting, *June* 11, 1754, granting to *Joseph Paine*, miller, " ten rods " square of land adjoining to his grist mill there, for a house " lot, to be as far above as below ye said mill."

A special act of the Legislature, passed *January* 24, 1828, entitled an act authorizing the owners of the falls and mill privileges on *Neguasset* falls to erect a dam thereon.

*John Shaw*, being again questioned, testified that he knew *John Paine, Moses Paine, Thomas Paine, Hannah Paine, Sarah Paine* and *Elizabeth Smart*, whose maiden name was *Paine*, — that they were the reputed children of *Joseph Paine*, and that they occupied and carried on the mills for many years, until they sold and conveyed to the *Stinsons*.  That as many as 50 or 60 years ago the dam was rebuilt, when one end was carried lower down, — perhaps 8 or 10 feet.

*Solomon Walker*, being again called by the plaintiff, said that

the dam, he believed, was raised from 16 to 20 inches, thirty years ago — that the raising of the dam made no difference as to the flowing of the plaintiff's meadow — that it was flat and low and always flowed.

William F. Gilmore, called by the plaintiff, testified that, there had been no difference in the flowing of this meadow for forty years last past — that the dam would flow it six feet deep — that the dam was no higher then, than it was as long ago as he could remember, and that he could recollect it before the fish ways were built, which was as early as 1791. That the plaintiff's meadow was low, and a low dam would flow it.

The defendant then called Zebadiah Farnham, who testified that, he had known the dam for 50 years — that it was not so high now as it was then — that there is a larger waste way now than formerly — and that a dam of four feet will flow the plaintiff's meadow two feet.

Abner H. Wade, testified that he had examined the plaintiff's meadow the present season, when the gates of the dam were all up, so as to present no obstruction to the water, and found the meadow covered with water from three to eleven inches — that this was the 28th of June, when the water was as low as at any time during the season.

Samuel Trott, testified that, he knew the old dam prior to the renewal of it by S. Walker — that about 18 years ago it was cut down from 20 to 24 inches — and that since that time it has not been so high as it was before said rebuilding. That the present dam does not flow so much of the plaintiff's meadow as the dam did 35 years ago — and that he had a good opportunity to judge from its effect upon his tan-yard.

William Foye, testified that, he was 84 years of age — that he was well acquainted with the premises 73 years ago — that there was then a saw mill and grist mill on the west side of the stream, owned by Joseph Paine, and a saw mill on the east side, occupied by John Gilmore, ancestor of one of the defendants. That Joshua Farnham, (one of the remote grantors of the defendants,) was the son of Daniel Farnham — that he frequented the mills in summer and winter, and that the dam was high enough to carry the mills well. That the Indians

about that time appeared there, and killed a number of persons in that vicinity and took a number of others captive, and wholly interrupted the settlement of that part of the country for many years — that there was a garrison near the mills which protected them and the persons employed therein — that there were no other mills near there at that time, people coming to them from *Topsham, Brunswick, Wiscasset,* &c.

*Morrill Hilton,* testified that, he knew the mills 68 years ago — that he had not seen the dam for 10 or 12 years, but that then, it was no higher than it was 50 years ago. He also testified to the same facts, stated by *William Foye.*

*Benjamin F. Tallman,* called by the plaintiff, testified that, on the 22d of *August,* 1832, he found no water on the plaintiff's meadow, and that there was at the same time two and a half feet at the defendants' dam — that on the 30th of the same month there was 15 inches of water on the plaintiff's meadow.

*Andrew Bailey,* called by the plaintiff, testified that, the present dam against the sluice was 7 feet in height, and was a slope dam.

*Daniel Hathorn,* also called by the plaintiff, testified that, the fish ways are not so large as they used to be, — that when the dam is full, the water flows six feet on the plaintiff's meadow.

The defendants' counsel contended, and requested the presiding Judge to instruct the jury, *First* — that if, while the *Proprietors* were owners in common of the land where the dam, mills and pond are situated, and the lands adjoining the same, including what is now lot No. 49, *they,* in order to raise a head of water to propel mills, erected, or authorised and caused to be erected, a dam, and subsequently granted and conveyed the dam and mills and land under the same, with the privileges and appurtenances thereto belonging ; and after that granted and conveyed said lot No. 49, that the grantees of the latter took and held it, subject to the right of the owners of the dam and mills, to keep up the same and flow the water as it had been previous to the grant or conveyance of the dam and mills by the Proprietors, without any claim for a payment of damages.

*Second* — that if the same facts existed as supposed in the first request, (with the exception that the Proprietors granted

and conveyed No. 49 *before* they conveyed the dam, mills and land under them, and privileges and appurtenances,) in such case, the grantee of No. 49 took and held it without any right to claim damages for flowing the water as it had been before the conveyance of No. 49.

*Third* — that if the dam, and mills and land, and No. 49, were owned by the same person or persons, and such owners conveyed the dam, and mills and land, and privileges and appurtenances, and afterwards conveyed No. 49, the grantee of No. 49 would have no right to claim damages for keeping up the water by the dam as it had been before the conveyance of No. 49.

*Fourth* — that if the same facts existed as supposed in the third request, (with the exception that the conveyance of No. 49 was before the conveyance of the dam, &c.) the grantee of No. 49 would have no right to claim damages for the continuance of the dam and pond, as they were before the conveyance of No. 49.

*Fifth* — that if the same facts existed as supposed in the third and fourth requests (with the exception that the same person was owner of a part in common instead of the whole) and conveyances were after made, that the grantee of No. 49 would have no right to damages for said flowing as aforesaid.

*Sixth* — that lot No. 49 being by the plan bounded *by the edge of the pond*, extends only to the margin of the pond, and does not embrace any land under water, when the pond is no higher than it was when lot No. 49 was created by survey and plan.

*Seventh* — that lot No. 49 being by the original plan by which it was created, bounded by the margin of the pond, the owner of No. 49 can claim no damages for the pond being kept up to the height it was when lot No. 49 was created by the survey and plan.

But the presiding Judge declined giving the several instructions as requested, and gave them the following, viz. 1. That where the same person is owner of a mill-dam, and also of a tract or parcel of land which is overflowed by water, raised and thrown back upon it, by means of such dam, if he should sell

and convey to A. B. the parcel flowed, reserving to himself, his heirs and assigns, the right to continue such dam and flowing without payment of damages, in such case, neither A. B. nor his heirs or assigns could maintain a complaint under our statute, against the grantor of A. B. his heirs or assigns ; but if no such right is reserved in the deed to A. B. then, though he purchases the land, subject to the right which the statute gives the grantor, to continue the dam and the flowing, yet he purchases it also with the right to recover damages for such flowing, which our statute in express terms gives to the owner of the land, whoever he may be. That the liability to damage and the right to recover compensation are inseparable, unless separated by special contract.

He also instructed them, that, when in the course of conveyancing, devise or descent, the same person is, for a time an owner, both in the dam which causes the flowing and in the land flowed, the right to recover compensation is *suspended* only during such ownership in both the dam and the land injured. Having laid down these general principles, he called the particular attention of the jury to the evidence relating to the time when the lot No. 49 was drawn, and became property in *severalty ;* all the records of the Proprietors having long since been lost. And the jury, in answer to a written inquiry on this point, returned a written answer, with their verdict, that the lands of the Proprietors were divided in the year 1740. In a similar manner he called their attention to the subject of the *mill* mentioned in the deed of *Hutchinson & al.* to *Savage,* dated *Feb.* 26, 1734, and also of *Paine's* mills, and the authority under which they were erected — and they certified that the *former* mill was not built by or under the authority of the Proprietors, and that the *latter* was not built by or under the authority of the Proprietors *before* the *division* in 1740. He further instructed the jury, that, as lot No 49 was bounded on the river, it extended to the *thread* of the river, whether in its *natural* width, or as raised and widened by means of the mill-dam. And further, that as every man had a legal right to erect a mill-dam on his own land and flow the land of his neighbour, no grant or license from the owner of the land flowed could be

presumed from length of time, or at least from the length of time proved in the present case.

He also instructed them, that the act of the Legislature of 1828, respecting the fishery and sluice ways, could have no effect to change or impair the rights of the complainant in the present prosecution.

The jury further certified, that the mill-dam had not been raised higher than it was formerly. If the foregoing instructions were correct, and those requested were in substance given or properly withheld, the verdict, which was for the plaintiff, was to stand as the basis of further proceedings ; if otherwise, the verdict was to be set aside and a new trial granted.

*Allen* and *Sprague*, for the defendants, said they were aware that the case of *Tinkham v. Arnold,* 3 *Greenl.* 120, would be urged as conclusive against the defendants — but they insisted that it was not conclusive upon the point raised in this case. The ground the Court go upon in that case is, that, the statute granting a right to use, and the owner not having the power to prevent it, no prescriptive right could be acquired *to the land.* There the prescriptive right of using, &c. was only considered as to how far it affected the *title to the land.* It is not, therefore, a conclusive authority in this case. No such claim is set up by the defendants. But it is contended that they have acquired *a right to flow* by *prescription,* having exercised that right for a period of 100 years.

Again, the mills and dam, and lot No. 49, were all originally owned by the same persons, by the Proprietors. While thus owning they conveyed the mills and dam, and afterward, No. 49. The first conveyance granted the right to flow, and the grantees of the latter took it subject to all legal incumbrances. Or if the conveyance of No. 49, were first in order of time, it would make no difference in the result. The grantees took it subject to the rights then existing of the owners of the mill — subject to the right to flow. *Oakley v. Stanley,* 5 *Wend.* 523 ; *Leonard v. White,* 7 *Mass.* 6 ; *Clement v. Durgin,* 5 *Greenl.* 9 ; *Stevens v. Morse,* 5 *Greenl.* 46 ; *Blake v. Clark,* 6 *Greenl.* 436.

By the conveyance of the mill with its privileges and appurtenances, every privilege would pass which was necessary to the operation of the mill, and which had before belonged to it. Whatever is necessary to the enjoyment of a thing, passes by the grant of that thing. *Incidents* are granted by *implication* with the *principal.* As flats with a wharf. A right of way over the grantor's land to a house in the middle of his field conveyed by him.

They further contended, that it was not competent for the jury to find when a division took place — that is matter of deed or record — in either case it was a question for the Court — and the verdict of the jury thus far at least was wrong.

The counsel also argued against the correctness of the instructions, in regard to the boundaries of the plaintiff's land, insisting that he was limited to the margin of the pond. The principle of grants extending to the middle of rivers is inapplicable to tide waters or to any considerable expanse of water. In this case by all the conveyances and by the Proprietors' plan it is denominated *a pond* — and the deed of the plaintiff bounds him *by the pond.* He is, therefore, limited *to the margin,* and no part of the land passed which was covered with water; — Or if it did pass, the plaintiff took it as it was, *covered with water,* and subject to the rights of the mill owners to flow it.

*Mitchell,* for the plaintiff, relied on the provisions of *Maine Stat.* of 1821, *chap.* 45. This statute gives an *absolute right* to any and all persons, to erect dam, mills, &c., and flow the lands of others — reserving to those others a right of redress for any injury sustained. This, it is apprehended, extends to all cases where the ownership of the mills is in one, and of the lands flowed, in another. Hence no right can be acquired by a user, or prescription; the parties must look to the statute for the origin and extent of their rights. *Tinkham v. Arnold,* 3 *Greenl.* 120.

If it were otherwise, a sufficient time has not elapsed by which such right could be acquired — for no time runs in this respect until after an appropriation of the land by the owner — and there is no proof of such appropriation till after 1789. *Wadross v. Wadross,* 3 *Con. R.* 373; *Cooper v. Barber,* *Taunt.*

*R.* 99; *Angel on Water Courses*, 71 ; *Vandeberg v. Van Bergen*, 13 *Johns.* 212.

A right to flow can only be acquired by deed or matter of record. It cannot be acquired by *prescription*, nor by *implication*, under a deed. *Thompson v. Gregory*, 4 *Johns.* 81 ; *Angel on Water Courses*, 208.

The boundary of the plaintiff's land is the thread of the river, though it may be so enlarged in a portion of it, by artificial means, as to acquire the character of a pond. There are no authorities in support of the position taken on the other side — nor has the practice been in accordance with it.

But this question has been settled by the jury, and is not now open to the defendants — that is, whether the plaintiff is in possession, and owner of the land *described in his complaint.*

. The opinion of the Court was delivered at a subsequent term, by

PARRIS J. — As the jury have found that the lands of the Proprietors were divided in 1740, and that no mill had previously been erected by them, or under their authority, there were no facts in the case justifying the first and second requests of the defendants' counsel. The Court are to charge the jury upon the law applicable only to the facts proved, but are not bound to answer abstract questions not arising in the case on trial. If the mills had been erected by the Proprietors previous to the division of their common property, so that the mill site and land flowed had not at that time become the separate property of any individual, the request of the defendants' counsel would have been pertinent, and it would have been the duty of the Court to have given the law, arising from those facts, to the jury.

The third request is, " that the Court would charge, that if " the dam, and mills and land, and No. 49, were owned by the " same person or persons, and such owners conveyed the dam, " and mills, and land and privileges and appurtenances, and *af-* " *terwards* conveyed No. 49, the grantee of No. 49, would have " on right to claim damages for keeping up the water by the dam, " as it had been before the conveyance of No. 49." The facts

are that the mills stand on a stream running southwardly or south-westwardly from *Neguassett* pond in the town of *Woolwich*; that lot numbered 49, which is now owned by the complainant, and on which he alleges the injury to have accrued by the flowing, is bounded eastwardly by the pond, or includes a part of the pond ; — that the mill stands below No. 49 on the adjoining lot, and that this mill site was occupied as such, in 1734, and has been so occupied ever since, and that the mill dam has not been raised higher than it was formerly. The respondent offered proof tending to shew, that upwards of fifty years ago, the mill site, mill and privilege, and lot No. 49 were owned by the same person, and that such person conveyed the dam and mill, and land and privileges and appurtenances, still retaining No. 49, and that he afterwards conveyed No. 49 to a different grantee. Upon this proof, the respondent moved for the instructions contained in his third request. If these instructions were properly withheld, or if they were substantially given, there is no ground for disturbing the verdict on this point. — Were they properly withheld ?

What would pass by the terms dam, mills, privileges and appurtenances ? It is a principle of law, that where a thing is granted, the grant implies a right to all the means of enjoying it, so far as the grantor was possessed of those means. 1 *Saund.* 322, 323. — The use of any thing being granted, all is granted necessary to enjoy such use ; and in the grant of a thing, what is necessary for the obtaining thereof is included. *Co. Litt.* 56. Where the principal thing is granted, the incident shall pass. *Co. Litt.* 152. — *Com. Dig. Grant, E.* 9. — In the construction of a grant, the Court will take into consideration the object which the parties had in view, and the nature of the subject matter of the grant.

From the proof reported in the case, it appears that the meadow, now owned by the complainant, has been flowed ever since the first mills were erected on the site where the respondent's mills now stand, which was, probably more than one hundred years ago ; — that the oldest witness examined, who could recollect seventy-three years ago, knew that, at that time, there was a dam there high enough to raise a sufficient head of water

to carry two saw mills and a grist mill well, and that the dam has always been high enough to flow the meadow owned by the complainant;—that the meadow was flat and low and always flowed, and that a dam thirty inches in height would flow it.—This has been the situation of the mill and dam ever since the site was first occupied, and of course it was thus when it belonged to the same person who owned the meadow flowed, being part of No. 49. While in his possession, the dam was kept up to the same height as it now is, and consequently, the meadow must have been flowed as it now is.—He, being the owner of the meadow as well as the dam, had a right to flow without being answerable for damages.

The mill could be of no use without a head of water sufficient for its operation, and that head could not be supplied, without continuing such a dam as would cause the meadow to be overflowed.—It was indispensably necessary to the enjoyment of the principal thing granted, and if, at the time of the conveyance of the mill and its privileges and appurtenances, the grantor was the owner of all the land flowed, we think that both upon principle and authority, the grantee acquired a right to continue the dam so as to raise the same head of water as the grantor had been accustomed to raise previous to the grant, provided that was necessary for the useful operation of the mill.—In *Blaine's Lessee v. Chambers,* 1 *Serg. & Rawle,* 169, the Court decided, that a devise of "a grist mill and ap-"purtenances," carried with it what was actually used as an appurtenant by the testator in his lifetime; and *Yeates J.* said, "by these words, every thing necessary for the full and free en-"joyment of the grist mill, and requisite for the support of the "establishment, such as a dam, water, the race leading to the "mill, a proper portion of ground before the mill for the un-"loading and loading of wagons, horses, &c. as used by the "testator would pass, for without these appurtenances the "grist mill could not be worked."—In *Pickering v. Stapler,* 5 *Serg. & Rawle,* 107, *Chief Justice Tilghman* says, "the wa-"ter right was appurtenant to the mill and passed by the word "appurtenances. This," says he, "appears so plain, that he "who denies it should show the authority on which he rests

" his opinion.. No such authority has been shown, but on the
" part of the defendant cases were produced, showing that priv-
" ileges of the kind in question pass by the name of appurte-
" nances."

In *Leonard v. White,* 7 *Mass.* 6, the question was, whether,
under a grant of a mill with all the privileges and appurtenan-
ces thereto belonging, the soil of a way passed, which had
been immemorially used for the purpose of access to the mill
from the highway. The Court held that the soil did not pass
but that the way, as an easement, might be appendant or appur-
tenant to the mill. — In *Blake v. Clark,* 6 *Greenl.* 436, the
Court go farther and decide that the term, " mill," may em-
brace the free use of the head of water existing at the time
of the conveyance, as also a right of way or any other ease-
ment, which has been used with the mill, and which is neces-
sary for its enjoyment. — In *Taylor v. Hampton,* 4 *McCord,*
96, the question now under consideration seems to have been
considered as settled, that the pond is an appurtenance of the
mill, and the purchaser has a right to keep up the water to
the height to which it was raised at the time he purchased,
even though the consequences were the overflowing of the
grantor's land. That was a case of very considerable magni-
tude, and was argued by some of the most able counsel in the
State, yet although the question we are now considering was
involved, and was of vital importance to the plaintiff, it was
not even taken by the counsel, and the Court assumed it as
settled, and as the starting point in their examination of the
case. — *Oakley v. Stanley,* 5 *Wend.* 523, was precisely like
the case before us. — In that it was decided, that the right to
overflow adjoining premises of a *grantor*, to the extent necessa-
ry for the profitable employment of a water privilege convey-
ed, in the manner in which it existed and had been used pre-
vious to the grant, passes to the *grantee* as necessarily appur-
tenant to the premises conveyed. The Court say, there can
be no question but the grantee acquired an absolute right to
maintain the dam at the height at which it was when he pur-
chased from the grantor, and that he or his grantees are not
responsible to the grantor or those who hold under him for

any injury which the adjoining premises may receive from an
overflow of water produced by the dam. — In *Strickler v.
Todd*, 10 *Serg. & Rawle*, 63, it was decided, that by convey-
ance of a mill, the whole right of water enjoyed by the grantor,
as necessary to its use, passes along with it as a necessary in-
cident ; and the grantor cannot, by the conveyance of another
lot of ground through which the stream passes, impair the right
to the use of the water already vested in the first grantee. — It
is unnecessary to extend this opinion by giving a summary of
other corroborating cases.   We will merely refer to *Whitney v.
Olney*, 3 *Mason's Rep.* 280 ; *Wetmore v. White*, 2 *Caines'
Cases in Error*, 87 ; *New Ipswich Factory v. Batchelder*, 3 *N.
Hamp. Rep.* 190 ; *Jackson v. Vermilea*, 6 *Cowen*, 677 ; *Nich-
olas v. Chamberlayn*, *Cro. Jac.* 121 ; and *Swansborough v.
Coventry*, 9 *Bingham*, 305.

From the view we have taken of this part of the case, we
are of opinion that the instruction was properly requested. —
Our next inquiry is, was it substantially given.   The first in-
struction given was, " that where the *same* person is owner of
" a *mill-dam* and also of a *tract or parcel* of land, which is
" overflowed by water, raised and thrown back upon it, by
" means of such dam, if he should sell and convey to A. B.
" the parcel flowed, reserving to himself, his heirs and assigns,
" the right to continue such dam and flowing without payment
" of damages, in such case neither A. B. nor his heirs or as-
" signs, could maintain a complaint under our statute against
" the grantor of A. B., his heirs or assigns." — Of the correct-
ness of this instruction there can be no doubt. — The state-
ment of facts upon which it was given supposes an express re-
servation to the grantor, of the right to flow, in which case the
grantee would clearly have no right to compensation for injury
occasioned by the flowing. — The charge proceeds, " but if no
" such right is reserved in the deed to A. B. then, though he
" purchases the land subject to the right which the statute gives
" the grantor to continue the dam and the flowing, yet he pur-
" chases it also with the right to recover damages for such flow-
" ing."   We are not disposed to question the correctness of
this part of the charge, but it is predicated on a different state

of facts from those supposed in the request under consideration and which the defendant contends he had proved. The facts assumed in the charge are, that the grantor conveyed *the premises flowed,* but retained the mill and dam ; — the facts claimed to have been proved, and on which the instruction was requested are, that the grantor conveyed *the mill, dam, privileges and appurtenances,* but retained a portion of the tract flowed. — In the latter case, we think the right to keep the dam to the same height it was continued by the grantor, and of course, to flow as much of his land as he was accustomed to flow, passed as an incident to the mill, necessary for its useful enjoyment, and that the grantee acquired an easement in so much of the grantor's land, as would be flowed by continuing the head of water at the mill at its usual height. — But the grantor's rights in the former case would depend upon a very different principle, which it is not necessary should be discussed or decided at the present time, as the facts proved do not require it. — The charge proceeds, " that where in the course of conveyancing, devise or " descent, the same person is, for a time, an owner, both in the " dam which causes the flowing and in the land flowed, the " right to recover compensation is *suspended* only during such " ownership in both the dam and the land injured." We think, in such a case the right to recover compensation is entirely *extinguished,* and that the owner may, by conveyance, again separate the title, without receiving the right to recover compensation. He may do it by express reservation, as is contemplated in the first branch of the charge in this case ; or he may do it, as the defendant contends was done in this case, by conveying the mill, &c., and the right to flow would follow as an easement, and consequently the right to recover compensation would not be revived. Or if he so conveyed as to entitle the purchaser of the lot flowed to compensation for the injury sustained by the flowing, it would not be a revival of any *suspended* right, but a creation of a new one, having its origin in the grant, and in facts existing subsequent thereto, but in no way depending upon the situation of the estate at any time prior to, or during the unity of possession. As in the case of easements or servitudes ; if the proprietor of the land or tene-

ment for which the easement or service was established, acquire the property of the land or tenement which serves, and afterwards sells it again without reserving the service, it is sold free, for the easement or service was extinguished by the unity of possession, and is not re-established to the prejudice of the new purchaser.   *Domat's Civil Law, lib.* 1, *sect.* 6, *tit. Services.*

We do not perceive that the instructions moved for in the defendant's third request were either expressly or substantially given, and believing the law to be as the Court were requested to instruct the jury, a new trial must be granted.   It is, therefore, unnecessary to discuss, at length, the other questions arising in the case.

The instruction " that as lot No. 49 was bounded on the riv " er, it extended to the thread of the river," is undoubtedly correct.   It was urged in argument that this principle did not apply to natural ponds and large collections of water, and that the boundary of lot No. 49 was a natural pond of two hundred rods in width, even before any flowing or obstruction by dams. How far such a state of facts would render the principle of law involved in this part of the charge inapplicable, we are not called upon to decide, as the case before us does not shew the existence of the facts.   The law of boundary, as applied to rivers, would, no doubt, be inapplicable to the lakes and other large natural collections of fresh water within the territory of this State.   At what point its applicability ceases it is unnecessary now to consider, as the case does not call for it.   Again, it was urged in the argument, that the complainant could not recover, because, by the terms of the conveyance, under which he held, he was limited by the margin of the pond, as kept up by the dam ; and the counsel supposed a case, where a grantor conveys by boundaries designated on a plan, and contended that by these boundaries the grantee must be governed.   No doubt he must.   The grantor has a right to prescribe such limits to his grant as he pleases.   If he bounds by a river, the grant extends to the channel ; but he may bound by monuments, which will limit his grant to the bank, or at any other point he pleases. *Dunlap v. Stetson,* 4 *Mason's R.* 349.   We have not before us any evidence that the grant of No. 49 was in express terms, or

Hathorn *v.* Stinson & als.

by reference to any plan or designated monuments, limited to the margin of the pond.

As to that part of the charge which relates to presumption of grant or license, we forbear to enter into a discussion of the question it involves.

This Court have decided, in *Tinkham v. Arnold*, 3 *Greenl.* 120, that the flowing of lands for the support of mills for any term of time, furnishes no presumptive evidence of *grant.* — Whether it may not amount to presumptive evidence of *license* remains to be settled. Here is a case where mills have been standing and water flowed, as at the present time, for one hundred years, and no claim for damages ever been asserted until the present suit. The party complainant has himself, been in possession of lot No. 49, under title, upwards of thirty years, during all which time the flowing has been uninterruptedly continued to the prejudice of his rights, if he had any. He and his grantors have seen the dam raised and lowered, repaired and rebuilt, without manifesting any opposition, or asserting any claim either to compensation for flowing, or to the land itself, and whether such facts, although not sufficient to raise a presumption of grant, may not afford presumptive evidence of license, so as to bar his claim to damages, is a question entitled to grave consideration. *Clement v. Durgin*, 5 *Greenl.* 14. We are aware that the law giving to mill owners a right to flow the land of others, which is a departure from the principles of the common law, has been viewed with some degree of jealousy, and that the policy of continuing its provisions has been doubted. *Stowell v. Flagg*, 11 *Mass.* 368. It is not our province to judge of the expediency of the law, but to administer it according to its fair interpretation. By it, the right to flow is granted, and also the correspondent right to damages. But where the flowing is under a license, or a grant of easement, the right to damages, under the statute, is barred.